**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION**

| | | |
|---|---|---|
| CASSANDER ROLLINS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CASE NO.: 1:24-CV-61 (LAG) |
| | : | |
| PHOEBE PUTNEY HEALTH SYSTEM, | : | |
| INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

## ORDER

Before the Court is Defendant Phoebe Putney Health System, Inc.'s Motion for Summary Judgment. (Doc. 21). For the reasons below, Defendant's Motion is **GRANTED**.

## PROCEDURAL BACKGROUND

On April 30, 2024, Plaintiff Cassander Rollins filed a Complaint against Defendant Phoebe Putney Health System, Inc. (Defendant). (Doc. 1). In her Complaint, Plaintiff asserts claims against Defendant for disability discrimination in violation of the American with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 *et seq.* and punitive damages. (Doc. 1 ¶¶ 21–32). As relief, Plaintiff seeks compensatory damages, backpay, actual losses, punitive damages, attorneys' fees, and prejudgment and post judgment interest. (*Id.* at 9). On July 10, 2025, Defendant filed the Motion for Summary Judgment. (Doc. 21). Plaintiff responded on August 1, 2025, and Defendant replied on August 28, 2025. (Docs. 27, 30; *see* Doc. 28). The Motion for Summary Judgment is now ripe for review. *See* M.D. Ga. L.R. 7.3.1(A).

**FACTUAL BACKGROUND**[1]

Plaintiff worked for Defendant as a Customer Management Representative (CMR) from June 5, 2023 to August 16, 2023. (Doc. 21-2 ¶¶ 1, 64; Doc. 27-1 ¶¶ 1, 64). As a CMR, Plaintiff acted as a liaison with insurance companies and was responsible for sending clinicals and medical documentation to the insurers and obtaining payments for patient visits. (Doc. 27-4 at 35:19–36:2, 66:7–19). Plaintiff initially was supervised by Serena Parker and later supervised by Rhonda Workman. (*Id.* at 32:17–19). Workman and Parker reported directly to Jean Cline, Phoebe's Corporate Director of Care Management. (*Id.* at 46:24–47:4; Doc. 27-5 at 7:11–14, 8:8–17). Rose Wynder and Karla Stone also worked in the CMR department and helped with Plaintiff's onboarding and training. (Doc. 27-4 at 33:3–9, 71:21–24).

New employees were to subject to an "orientation/probationary period" of 120 days.[2] (Doc. 27-5 at 21:3–11; *see* Doc. 21-4 at 3). While Plaintiff previously had worked for Defendant as a Patient Access Specialist from 2019 to 2022, as a new CMR, she was subject to the probationary period. (Doc. 27-4 at 34:10–12; Doc. 21-1 at 2; Doc. 27-5 at 20:23–21:11). According to Cline, the probationary policy served as a "guideline in reference to the onboarding and training of [a new employee] to ensure that . . . there was a good grasp of the foundations" and to make sure that the employee "had all the tools and the training that they needed in the specific job scope." (Doc. 27-5 at 22:3–11).

Defendant's attendance policy (the Policy) applied during the probationary period and throughout employment with Defendant. The Policy defines various forms of absenteeism and tardiness as follows:

---

[1]    The relevant facts are derived from Defendant's Statement of Material Facts (Doc. 21-2), Plaintiff's Response to Defendant's Statement of Material Facts (Doc. 27-1), Plaintiff's Statement of Material Facts to Which There Are Genuine Issues to be Tried (Doc. 27-2), and the record in this case. The Court construes the facts in the light most favorable to Plaintiff, the nonmoving party. *See* Fed. R. Civ. P. 56; *Jacoby v. Baldwin County*, 835 F.3d 1338, 1342–43 (11th Cir. 2016).
[2]    The Court notes that neither Plaintiff nor Cline can recall whether the probationary period is 90 or 120 days. (Doc. 27-4 at 34:10–18; Doc. 27-5 at 21:7–11). The attendance policy refers to a 120-day introductory period. (Doc. 21-4 at 3). Regardless of whether the policy is 90 or 120 days, Plaintiff worked at Phoebe for 72 days and therefore, was in the probationary period when her employment ended. (*See* Doc. 27-1 ¶¶ 1, 64).

| | |
|---|---|
| **Scheduled Absence:** | A scheduled absence is defined as any time off from scheduled work that is approved in advance by the employee's supervisor (includes absences due to bereavement, jury duty, etc.) |
| **Unscheduled Absence:** | An unscheduled absence is defined as any time off from scheduled work that is not approved in advance. |
| **Tardiness:** | Tardiness is defined as reporting to the workstation after an individual's scheduled start time (Note: Failure to clock in will result in assignment of a tardy) |
| **Leaving Early:** | Leaving early is defined as leaving your workstation without management approval before the end of your scheduled shift. |
| **Excluded Tardies:** | Tardies that have been approved by the department supervisor for circumstances such as weather-related emergencies or due to time clock malfunctions verified by the department supervisor or IS Support Team. These occasions must be excused at time of occurrence. |
| **Excluded Absences:** | Excluded absences are those that are approved under the Family and Medical Leave Act (FMLA) or made as part of a reasonable accommodation. |

(Doc. 21-4 at 2–3). The Policy further states: "Employees are expected to be on time, dressed in accordance with job requirements, and ready to begin the shift at the moment the shift starts." (*Id.* at 3). When an absence has not been pre-approved and an employee needs to miss work or "call out, (i.e., have an unscheduled absence)" she is supposed to phone the "call-in line" "two hours prior to [her] shift." (Doc. 27-5 at 25:22–23; Doc. 21-4 at 3). An administrative assistant was "responsible for the overall operations of the department from a clerical perspective" and manned the call-in line. (Doc. 27-5 at 27:1–8, 9:22–24).

The Policy further provides that, "Violations of the attendance policy will be reflected in employee evaluations and can lead to discipline up to and including

3

termination." (Doc. 21-4 at 3). The Policy then sets out procedures and disciplinary levels related to unscheduled absences and tardiness. (*Id.* at 3–5). There are six disciplinary levels ranging from Coaching to Termination. The levels are not detailed in the Policy; however, according to Cline, an employee "could" be subject to coaching for one tardiness occurrence (being late twice in the same pay period). (Doc. 27-5 at 52:3–6). It does not appear that coaching is a disciplinary step taken for absenteeism. A level one violation occurs on the fourth unscheduled absence occurrence and on the second tardiness occurrence. If, however, a fourth unscheduled absence occurrence or level one violation occurs within an employee's 120-day introductory period, "termination" may be contemplated. (Doc. 27-5 at 36:15–18). If an employee successfully completes the probationary period, and if there are additional occurrences, "the disciplinary process would [escalate] to a level two or three or possibly . . . termination, based on attendance." (*Id.* at 36:18–23). Cline clarifies that, though not explicitly reflected in the text of the Policy, a fifth occurrence may also include termination. (*Id.* at 37:4–11).

Regarding unscheduled absences, employees are allowed up to three occurrences of unscheduled absences in one rolling calendar year. (Doc. 21-4 at 3). An unscheduled absence "occurrence" is defined as three consecutive days off. (*Id.*). The disciplinary steps for absenteeism are:

- 4th occurrence (for any reason): Level I
- 5th occurrence (for any reason): Level II
- 6th occurrence (for any reason): Level III
- 7th occurrence (for any reason): Termination

(*Id.*). For those on probation, a fourth unscheduled absence occurrence could result in termination. (*Id.*; *see* Doc. 27-5 at 35:14–23).

Regarding unscheduled tardiness or leaving early, the Policy states: "An employee who must be late must inform [their] supervisor as soon as possible prior to the start of the shift. Informing the supervisor does not excuse the tardiness … Employees are also expected to remain at work through the end of the work shift unless relieved by the . . . supervisor." (Doc. 21-4 at 4). One tardiness occurrence is defined as "[b]eing tardy or

4

leaving early two (2) or more times within a pay period[.]" (*Id.*). The disciplinary steps for tardiness and/or leaving early are:

- 1st occurrence: Documented Coaching
- 2nd occurrence or 7th tardy[:] Level I
- 3rd occurrence or 8th tardy[:] Level II
- 4th occurrence or 9th tardy[:] Level III
- 5th occurrence or 10th tardy[:] Termination

(*Id.*). Lastly, the Policy states that "[a]ny deviation from this policy requires the approval [of] Human Resources." (*Id.*).

Employees were expected to work for eight hours a day, and those in the Care Management Department generally worked from 8 AM to 4:30 PM. (Doc. 27-4 at 36:25–37:6, 37:20–22; Doc. 27-6 at 19:1–2, 10–25). According to the Policy, employees are "expected to remain at work through the end of the work shift unless relieved by the[ir] . . . supervisor." (Doc. 21-4 at 4). Moreover, while employees could have flexible hours, such flexibility was "at the discretion of the director." (Doc. 27-6 at 19:1–2, 10–25). According to Plaintiff, while she understood that the workday was "supposed to be [an] average [of] eight hours," she believed that she could leave "[w]hen [she] was done with [her] work." (Doc. 27-4 at 36:25–37:6, 37:20–22). According to Cline, an employee "[couldn't] just decide from day to day as long as [they] make [their] eight hours, whatever hours [they] work, it's okay. [The employee] would have to go through [Cline] to get a different schedule." (Doc. 27-6 at 45:6–9). The record shows that Plaintiff clocked in after 8 AM 36 times during her employment as a CMR.[3]

On June 13, Plaintiff emailed Workman to request June 27 off to take her mother to a doctor's appointment and offered to bring a work excuse. (Doc. 27-4 at 52:23–53:6). Workman does not recall if she ever advised Plaintiff that the formal way to request time

---

[3]     Plaintiff clocked in after 8:00 AM on June 6, June 7, June 8, June 9, June 12, June 13, June 14, June 15, June 16, June 20, June 21, June 26, June 28, June 29, June 30, July 3, July 5, July 6, July 7, July 10, July 12, July 13, July 19, July 21, July 31, August 1, August 2, August 3, August 4, August 7, August 8, August 9, August 10, August 11, August 14, and August 16.

off was through a pink slip—a sheet that employees filled out to request time off—not e-mail. (Doc. 27-6 at 49:4–25; 41:17–22). On July 5, Plaintiff emailed Workman: "My mom['s] next appt [is] in Augusta [on] July 27th at 9:30 am. And her Dr appt is at 1:40 pm. I will need to take that day off. Then after this appt the surgery will be scheduled." (Doc. 21-10 at 2). Plaintiff's July 27 absence was approved, and according to Cline, she "[should] not have incurred an occurrence" for being off that day. (Doc. 27-5 at 58:7–17).

On July 24 at 7:38 AM, Plaintiff texted Workman that she was going to the emergency room (ER) because she had hurt her back the day before. (Doc. 21-2 ¶ 26; Doc. 27-1 ¶ 26). Plaintiff wrote:

> Good morning Rhonda, I'm going to the ER this morning to get the lower part of my back and right leg checked. I hurt my back yesterday and the pain is shooting down my leg. I took pain meds, muscle relaxer and used cream but I can barely walk on my leg. I will keep you updated if I'm able to come to work. Thank you[.]

(Doc. 21-8 at 2). Workman responded, "Ok. Prayers[.]" (*Id.*). Plaintiff replied, "Thank you. They're going to give me 2 shots and don't want me to drive. So I probably won't be in today. I'm sorry[.]" (*Id.*). Workman said, "Okay. Hope you feel better [] soon." (*Id.*). Workman notified Cline and the other CMRs that Plaintiff would not be in so that Plaintiff's assignment could be covered. (Doc. 27-6 at 24:16–18, 25:17–21). The Doctor who treated Plaintiff noted: "Will discharge with prescriptions for prednisone and Ultram. I will refer her to Ortho. We will give her IM Valium and dexamethasone for pain here. Return precautions were discussed. She verbalized understanding of the care plan and is agreeable." (Doc. 21-9 at 6). The doctor's clinical impression was "[a]cute low back pain with sciatica[.]" (*Id.*). Under additional instructions, the doctor wrote: "Rest. Alternate warm and cool compresses to the back. Please follow-up with orthopedist; call upon discharge for an appointment." (*Id.* at 7). The doctor also listed Plaintiff's return to work date as July 27, 2023. (*Id.* at 9).

On July 25, in an effort to clarify Plaintiff's return date so that she could arrange for coverage, Workman texted Plaintiff, "Hey! I didn't realize you are out until 7/27" and

Plaintiff responded, "Yes ma'am and I'm off on the 27th for my mom['s] appointment as well[.]" (Doc. 27-14 at 2; *see* Doc. 27-6 at 28:2–4, 17–21). Workman replied, "Please let us know if you are able to work sooner. So, actually, you will return on Friday 7/28? Right?" (Doc. 27-14 at 2). Plaintiff said yes with a thumbs up emoji. (*Id.*).

On July 26, Plaintiff went to a follow-up appointment with her primary care physician, but was seen by another doctor, Dr. Jithin George. (Doc. 27-4 at 61:17–62:5). On his signed note, Dr. George listed Plaintiff's return to work date as July 31, 2023. (Doc. 21-12 at 2). He left the "work limitations" section blank. (*Id.*). Based on this note, Plaintiff returned to work on July 31 instead of July 28. (Doc. 27-4 at 62:18–21; *see id*. at 63:10–13 (when asked, "so did you provide anyone in your department with any medical records or anything in response to this work excuse[,]" Plaintiff responded, "[n]o")). It is not clear whether Plaintiff advised Workman or anyone else about the updated return to work date or forwarded the note to anyone. Moreover, Plaintiff never spoke to HR about her medical situation or requested any type of accommodation. (*Id.* at 62:25–63:3, 63:10–13).

After her return to work, Plaintiff had some interactions with Wynder that upset her. On August 8, Wynder emailed Plaintiff, copying Workman, Stone, Parker, and Cline, asking Plaintiff for advisement on an issue regarding a patient account. (Doc. 21-14 at 2). Plaintiff responded, "I don't recall" and Wynder responded that "not recalling [could] result in loss revenue." (*Id.* at 3–4). Plaintiff texted Workman later that same day:

> . . . I'm at the end of my rope with [Wynder]. She just keeps trying to get under my skin. I don't feel that I should have to work under these conditions. I want to stay in good standing with Phoebe. I didn't come here to continually be harassed. I just want to work and she's making it difficult for me to do that. I'm not putting in my notice but if it doesn't stop[] I will be speaking with human resources to see what my options are. This is so unnecessary.

(Doc. 21-15 at 2). Workman responded: "I understand[.] I'm sharing your concerns with [Cline and Parker] as well." (*Id.*).

On August 9, Wynder emailed Cline to inform her that Plaintiff had faxed patient information to the wrong insurance company. (Doc. 21-16 at 2). Cline responded, copying

Parker and Workman, "Thank you for bringing this issue forward. I am copying [Parker] on this email to ensure appropriate reporting and follow up. [Parker]: please see me. Thanks[.]" (*Id.*). That same day, Wynder emailed Plaintiff asking her to review a patient account where Plaintiff faxed information to the wrong insurance company. (Doc. 21-17 at 2). Wynder copied Workman, Cline, Parker, and Stone on the email. (*Id.*). On August 10, Parker followed up with Plaintiff to determine if the information was actually sent to the wrong insurance company or if it was an "error in typing[.]" (*Id.* at 3). Parker explained that she was asking because "[she had] to track any misdirected faxes." (*Id.*).

Plaintiff emailed Phoebe's Human Resources Director, Brenda Johnson, on August 10, to set an appointment to discuss "concerns about [her] job position[,]" and an appointment was set for August 14. (Doc. 21-2 ¶ 55; Doc. 27-1 ¶ 55; Doc. 21-18 at 2; Doc. 21-19 at 2). On the 14th, however, Plaintiff emailed Johnson and canceled the appointment. (Doc. 21-2 ¶ 55; Doc. 27-1 ¶ 55; Doc. 21-19 at 2). Plaintiff advised Johnson that she would "contact [her] at a later date to reschedule." (Doc. 21-19 at 2). The next day, Plaintiff emailed Johnson:

> I don't think that this position is working out for me. I remember during orientation you spoke about if the position didn't work, not to quit which I want to stay in good standing with Phoebe and I would like to apply for a different position. I would like to know what my options are.

(Doc. 21-2 ¶ 61; Doc. 27-1 ¶ 61; Doc. 21-22 at 2). That same day, Plaintiff received notice from the Phoebe Recruitment Team "that they had received her application for the position of 'Medical Center Rep – Lee Urgent Care 270074.'" (Doc. 21-2 ¶ 62; Doc. 27-1 ¶ 62). As Plaintiff was a Phoebe employee, the application directed her to "list [her] department and [dates] worked[.]" (Doc. 21-2 ¶ 63; Doc. 27-1 ¶ 63). In response to this direction, Plaintiff wrote, "Case Management Rep 06/05/2023 to 08/16/2023[.]" (Doc. 21-2 ¶ 63; Doc. 27-1 ¶ 63).

While Plaintiff was considering leaving the care management department, department leadership was also considering terminating Plaintiff's employment. After Plaintiff canceled the August 14th meeting with Johnson, Johnson emailed Cline and Kim

8

Whitley, Cline's supervisor: "[Plaintiff] decided to not go through with meeting me today so I am unable to determine what we were to discuss." (Doc. 27-11 at 1; *see* Doc. 27-5 at 64:18–22). Cline responded, "Question? Do we have enough to terminate?" (Doc. 27-11 at 1). Johnson replied all: "Has [Plaintiff] been made aware of the concerns with her attendance? The summary [Parker] sent me only shows a discussion about performance that was minor . . . Did you ever hear any more regarding the HIPAA violations?" (Doc. 27-12 at 1). Cline responded, "Thanks for the reminder. I will follow up." (*Id.*).

On August 15, Plaintiff called out because "[she] wasn't feeling well[.]" (Doc. 27-4 at 65:16–24). Cline emailed Plaintiff, copying Workman and Parker: "I understand you called out today. Upon your return, please stop by my office. Thank you." (Doc. 21-21 at 3). A few minutes later, Johnson emailed Cline:

> I think it is time to move forward with releasing during the introductory period due to the continuation of absences. If [Plaintiff] returns tomorrow and you plan to proceed, I will need to be present. The earliest I am available tomorrow is 1:30 [PM.] Attached is the corrective counseling statement you will need to complete. Violation will be "Release during introductory period–Attendance"

(*Id.* at 2). Cline responded, "I will make myself available at 1:30[ PM]. Thank you much for the support. I will complete the attached and return to you." (*Id.*). Cline copied Whitley. (*Id.*).

On August 16, Cline called a meeting with Plaintiff and Johnson. (Doc. 27-5 at 88:5–20). According to Plaintiff, she was told that it was in her best interest to resign, because if she was terminated, she would not be able to return to Phoebe. (Doc. 27-4 at 82:1–5). At the end of the meeting, Plaintiff wrote, signed, and tendered her resignation to Cline. (Doc. 21-24 at 2; Doc. 27-5 at 97:4–10). Following her resignation, Plaintiff scheduled a meeting with Johnson for August 21 at 1:00 PM. (Doc. 21-2 ¶ 70; Doc. 27-1 ¶ 70). Twenty-two minutes before the scheduled meeting, Plaintiff emailed Johnson to cancel the meeting. (Doc. 21-2 ¶ 70; Doc. 27-1 ¶ 70; Doc. 21-25 at 3). Plaintiff wrote:

> I know that we scheduled an appointment today at 1:00 by phone. However, this whole situation regarding the resignation

and speaking with you regarding what issues I had with my coworkers has brought on more stress than I could handle. I'm not a confrontational person and I'm not used to having to deal with stuff like this. So therefore I think that I would like to cancel the appointment for today. I would like to move forward and leave this unfortunate incident in the past. I literally have more important things that needs my attention. I know that I did all that I can do and I'm ok with that. Thank you for your concern. Have a great day!

(Doc. 21-25 at 3). Johnson responded, "I have reviewed your documentation and will look into this matter further. If you change your mind and wish to speak to me, I will be more than glad to hear your concerns. Take care." (*Id.* at 2).

On December 13, 2023, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC). (Doc. 21-20). In Plaintiff's Charge of Discrimination, she wrote that she "was constructively discharged" because she was told she would be terminated if she did not resign. (Doc. 21-2 ¶ 58; Doc. 27-1 ¶ 58; Doc. 21-20 at 2). The EEOC issued a "Right to Sue" letter on February 1, 2024. (Doc. 1-2). Plaintiff timely filed the Complaint. (Doc. 1).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate where "the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc) (quoting Fed. R. Civ. P. 56(a)). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (citation omitted). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citations omitted). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1311 (11th Cir. 2018) (quoting *Hickson Corp. v. N.*

10

*Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004)). At summary judgment, the Court views the evidence "in the light most favorable to the non-moving party" and resolves factual disputes for the nonmoving party when doing so is supported by sufficient evidence. *Gogel*, 967 F.3d at 1134 (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007)); *Whitehead v. BBVA Compass Bank*, 979 F.3d 1327, 1328 (11th Cir. 2020).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018); *Whitehead*, 979 F.3d at 1328. The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact or by demonstrating that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013) (per curiam). If the movant meets their initial burden, the nonmoving party must demonstrate that there is a genuine dispute for trial. *See Lamar v. Wells Fargo Bank*, 597 F. App'x 555, 556–57 (11th Cir. 2014) (per curiam) (citing *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991)). The nonmovant must "go beyond the pleadings and . . . present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating specific facts showing a genuine issue for trial." *Id.* (citing *Celotex Corp.*, 477 U.S. at 324).

## DISCUSSION

Defendant argues that it is entitled to summary judgment because (1) Plaintiff did not have a disability under the ADA; (2) Plaintiff never communicated to Defendant that she had a disability; (3) Plaintiff has failed to produce evidence that Defendant committed any act based on a discriminatory motive; (4) as Plaintiff voluntarily resigned, Plaintiff was not subject to an adverse employment action; and (5) even if Plaintiff was terminated, Defendant had a legitimate non-discriminatory reason for the termination. (Doc. 21-1 at 12–21). Defendant further argues that Plaintiff's punitive damages claim is not a stand-alone substantive claim as "such damages would be . . . a potential element of her recovery

11

on the substantive claim[.]" (*Id.* at 1 n.1). Plaintiff responds there are genuine issues of material fact as to (1) whether Plaintiff is an individual with a disability as defined by the ADA; (2) whether Defendant had notice of Plaintiff's disability; (3) whether Plaintiff was subject to discrimination because of her disability; and (4) whether Plaintiff resigned or was constructively discharged. (Doc. 27 at 3–12).

## I.    Disability Discrimination (Count I)

The ADA prohibits discrimination by an employer "against 'a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.'" *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999) (quoting 42 U.S.C. § 12112(a)). To survive summary judgment on a disability discrimination claim, a plaintiff must present "either direct or circumstantial evidence" that "would allow a reasonable jury to find that the [employer]" took an adverse action against her, "and thus discriminated against her because of her disability[.]" *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1214 (11th Cir. 2021) (citation omitted). In a case such as this where there is no direct evidence of discrimination, a plaintiff can establish intentional discrimination under either the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or the convincing mosaic standard. *Todd*, 998 F.3d at 1215; *Walls v. Lowe's Home Ctrs., LLC*, 789 F. App'x 852, 854 (11th Cir. 2019) (per curiam) (citing *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255 (11th Cir. 2012)); *see also McCreight v. AuburnBank*, 117 F.4th 1322, 1334–36 (11th Cir. 2024).

### A. *McDonnell Douglas* Analysis

Under the three-part *McDonnell Douglas* framework, a plaintiff must first demonstrate a *prima facie* case. *See Ismael v. Roundtree*, 161 F.4th 752, 759 (11th Cir. 2025). "To establish a prima facie case of discrimination under the ADA, a plaintiff must show: (1) [s]he is disabled, (2) [s]he is a qualified individual, and (3) [s]he was subjected to unlawful discrimination because of [her] disability." *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1255–56 (11th Cir. 2007) (citation omitted). If the plaintiff establishes a prima

12

facie case of discrimination, "the burden of production then shifts to her employer to articulate a legitimate, nondiscriminatory reason for its actions." *Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1338 (11th Cir. 2022) (citation omitted). If the employer satisfies this requirement, "plaintiff has the opportunity to demonstrate that the employer's proffered rationale is pretextual." *Ismael*, 161 F.4th at 759.

### i. Disability

Under the ADA, the term "disability" means (1) "a physical or mental impairment that substantially limits one or more major life activities[,]" (2) "a record of such impairment[,]" or (3) "being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)–(C). A plaintiff is deemed to be "disabled" under the ADA "if she satisfies any one of these three definitions." *Hillburn*, 181 F.3d at 1226. Congress has directed courts to construe the definition of disability "in favor of broad coverage of individuals under [the ADA], to the maximum extent permitted by the terms of [the ADA]." 42 U.S.C. § 12102(4)(A). "The question of whether an individual meets the definition of disability . . . should not demand extensive analysis." 29 C.F.R. § 1630.1(c)(4). Rather, Congress's express intent was "that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations." Pub. L. No. 110–325, § 2(b)(5), 122 Stat. 3553, 3554. "Congress intended that the establishment of coverage under the ADA should not be overly complex nor difficult, and expected that the ADAAA will lessen the standard of establishing whether an individual has a disability . . ." *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 n.2 (11th Cir, 2014) (citations, alterations, and internal quotation marks omitted).

The Parties dispute whether Plaintiff has "a physical or mental impairment that substantially limits one or more major life activities[.]" 42 U.S.C. § 12102(1)(A). Plaintiff argues that, in July of 2023, she experienced a "sudden, incapacitating, episode of back pain[.]" (Doc. 27 at 5). Physical impairments may be episodic and include "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, muscoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive,

13

genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine[.]" 29 C.F.R. 29 C.F.R. § 1630.2 (h)(1); *see also id.* § 1630.2(j)(1)(vii). Viewing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff's back pain is an "impairment" under the ADA. "However, a physical impairment alone is not necessarily a disability under the ADA." *Hillburn*, 181 F.3d at 1226 (citation omitted).

Whether Plaintiff is actually disabled turns on whether her back pain substantially limited one or more major life activities. To determine whether Plaintiff's back pain is substantially limiting, the Court compares Plaintiff's ability to perform major life activities "to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). The functional limitation required is lower than the standard applied prior to the ADAAA, and the analysis usually does not require medical, scientific, or statistical evidence. *See id.* § 1630.2(j)(1)(iv)–(v). Congress passed the ADAAA "to, among other things, promulgate a more liberal standard of the term 'disabled,' making it significantly easier for a plaintiff to show disability." *Coker v. Enhanced Senior Living, Inc.*, 897 F. Supp. 2d 1366, 1374 (N.D. Ga. 2012) (quoting *Barlow v. Walgreen Co.*, No. 8:11-cv-71-T-30EAJ, 2012 WL 868807, at *4 (M.D. Fla. Mar. 14, 2012)). "An impairment that is episodic . . . is a disability if it would substantially limit a major life activity *when active*," and "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . medication." 29 C.F.R. § 1630.2(j)(1)(vii) (emphasis added); 42 U.S.C. § 12102(4)(E)(i)(I); *see also* Pub. L. No. 110–325, § 2(b)(2), 122 Stat. 3553 (codified at 42 U.S.C. § 12102(4)(E)(i)) (stating Congress' purpose "to reject the requirement enunciated by the Supreme Court in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999) and its companion cases that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures"). Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). An

impairment only needs to substantially limit one major life activity to be a disability. *Id.* § 12102(4)(C).

Plaintiff was diagnosed with "[a]cute low back pain with sciatica" after feeling a shooting pain in her back and right leg. (Doc. 21-9 at 6). She also reports being "stuck" during the episode and was taken to the hospital by ambulance. (Doc. 27-4 at 57:22–25; Doc. 21-9 at 2, 4). Applying the ADAAA's liberal standard and construing the facts in the light most favorable to Plaintiff, Plaintiff's back pain with sciatica constitutes an episodic impairment that substantially limits a major life activity. Therefore, Plaintiff satisfies the first prong and is an individual with a disability as defined by the ADA.

### ii.  Qualified Individual

"In order to make out the second prong of [her] prima facie case, [Plaintiff] must prove that [s]he is a 'qualified individual'—that is, someone with a disability who, 'with or without reasonable accommodation, can perform the essential functions of the employment position that such an individual holds[.]'" *Holly*, 492 F. 3d at 1256 (first quoting 42 U.S.C. § 12111(8); and then citing *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000) (per curiam)). Defendant does not argue that Plaintiff was not a qualified individual, and there is no evidence that Plaintiff could not perform the essential functions of the CMR position.

### iii. Discrimination Because of Disability

To meet the third element of her *prima facie* case, Plaintiff must establish that the adverse employment action—her alleged constructive termination—would not have occurred but for her disability. *See Akridge v. Alfa Ins. Co.*, 93 F. 4th 1181, 1192 (11th Cir. 2024). It is questionable that Plaintiff was constructively discharged; but, even if she was, her disability was not the but-for cause of any such constructive discharge.

"A constructive discharge qualifies as an adverse employment action." *Menzie v. Ann Taylor Retail Inc.*, 549 F. App'x 891, 894 (11th Cir. 2013) (citation omitted). "[E]mployee resignations are presumed to be voluntary," and "[a] voluntary resignation is not an adverse action[;] but a resignation is not voluntary if it was a constructive discharge forced by an employer's duress or misrepresentation of a material fact." *Hargray v. City of*

*Hallandale*, 57 F.3d 1560 (11th Cir. 1995) (per curiam) (citations omitted); *Harrison v. Sheriff, Holmes County Florida*, 2024 WL 449374, at *4 n.7 (11th Cir. Feb. 6, 2024) (citing *Hargray*, 57 F.3d at 1567, 1570). Plaintiff argues that her resignation constitutes a constructive discharge because she was given a choice between termination and resignation at a meeting during which her back pain and work deficiencies were discussed. The question when determining whether a resignation constitutes constructive discharge is "whether the employee can demonstrate that [s]he was discriminated against by [her] employer to the point where a reasonable person in [her] position would have felt compelled to resign." *Davis v. Legal Services Alabama, Inc.*, 19 F. 4th 1261, 1268 (11th Cir. 2021) (citing *Green v. Brennan*, 578 U.S. 547, 555 (2016)). An employee's resignation "will [also] be deemed involuntary—and, thus, qualify as an adverse employment action— where the employer (1) forces the resignation by coercion or duress, or (2) obtains the resignation by deceiving or misrepresenting a material fact to the employee[.]" *D'Angelo v. WellStar Medical Group, LLC*, No. 1:18-cv-3873, 2020 WL 13660322, at *5 (N.D. Ga. July 7, 2020), *report and recommendation adopted*, 2020 WL 13660326 (N.D. Ga. Aug. 10, 2020) (quoting *Rossi v. Fulton Cnty., Ga.*, No. 1:10-CV-4254-RWS-AJB, 2013 WL 1213149, at *19 (N.D. Ga. Jan. 31, 2013)).

Assuming that advising Plaintiff that resigning rather than being terminated would benefit her chances of being rehired by Defendant constitutes coercion, Plaintiff has not established that her disability was the but-for cause of her pending termination. Establishing discrimination "on the basis of disability" requires Plaintiff to show that her alleged constructive discharge would not have occurred but for her disability. *See Akridge*, 93 F.4th at 1192–94 (explaining that the amended "on the basis of disability" language, which replaced "because of," did not change the requirement to show but-for causation). In other words, Plaintiff must demonstrate that the termination was caused by her disability. *See Holly*, 492 F.3d at 1263 n. 17. But "an employee cannot be fired 'because of' a disability unless the decisionmaker ha[d] *actual* knowledge of the disability." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1185 (11th Cir. 2005). Constructive knowledge of a disability is insufficient. *See id.* Thus, Plaintiff must present evidence from which a

16

reasonable factfinder could conclude that Cline or Johnson, the relevant decisionmakers, had actual knowledge of her disability. *See id.* at 1175, 1180. Plaintiff has not met this burden.

It is undisputed that Plaintiff exclusively communicated with Workman about her disability. These communications included (1) Plaintiff's texts to Workman about the July 24 back pain incident and (2) the first doctor's note. (Doc. 21-8; Doc. 27-4 at 62:22–63:13). There are no texts or emails in the record indicating that Plaintiff provided Workman with Dr. George's note. (*See* Doc. 27-4 at 62:22–63:13; *id.* at 63:10–13 (when asked, "so did you provide anyone in your department with any medical records or anything in response to this work excuse[,]" Plaintiff responded, "[n]o")). Moreover, there is no evidence that Workman discussed Plaintiff's texts or doctor's note regarding her back pain with Cline. (*See* Doc. 27-5 at 25:1–13). Furthermore, Plaintiff admits that she did not advise anybody in HR or anyone other than Workman about her back pain and that she did not supply Defendant with any medical records related to her disability. (Doc. 27-4 at 62:22–63:13, 63:10–14); *see McCray v. Florida Gypsum, LLC*, No. 6:23-cv-1567-JSS-RMN, 2025 WL 1489826, at *12 (M.D. Fla. May 23, 2025) (granting summary judgment as to plaintiff's ADA claim where he only provided one doctor's note, "which stated only that [p]laintiff would be out for a week without explanation"); *see also Morisky v. Broward County*, 80 F.3d 445, 448 (11th Cir. 1996) (affirming grant of summary judgment as to a plaintiff's ADA claim where she did not inform defendant of her specific disability reasoning that "[v]ague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA"). While Workman had actual knowledge of Plaintiff's disability, she was not the relevant decision maker here; nor was she copied on emails where Cline and Johnson contemplated Plaintiff's termination or at the August 16 meeting. (*See* Doc. 27-11 at 1; Doc. 27-12 at 1). Thus, as there is no evidence that Cline or Johnson had actual knowledge of Plaintiff's disability, her constructive termination could not have been on the basis of her disability.

Moreover, the record shows that Cline and Johnson were contemplating firing Plaintiff because of her tardiness, substantive mistakes, and inter-personal issues with a co-

17

worker. At some point prior to August 14, Cline had spoken to her superior, Whitley, and Johnson about concerns with Plaintiff's attendance and HIPAA violations. Plaintiff also had conflict with Wynder which led Plaintiff to tell Workman (who told Cline and Parker) that she was contemplating putting in her notice. Thus, even if Plaintiff's absences related to her back pain were a reason for her termination, they were not the but-for cause of her termination. As Plaintiff has not established that her disability was the but-for cause of her termination, she has not established a prima facie case.

### B. Mosaic Analysis

Given that Plaintiff has failed to establish a prima facie case of disability discrimination, we "advance directly to the convincing mosaic inquiry." *Ismael*, 161 F.4th at 765. "[A] plaintiff can survive summary judgment if [s]he presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Jones v. Georgia Ports Authority*, No. 22-12844, 2024 WL 470347, at *4 (11th Cir. Feb. 7, 2024) (per curiam) (citing *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)); *see also Todd*, 998 F.3d at 1215–16; *Walls*, 789 F. App'x at 854 (per curiam) (citing *Chapter 7 Tr.*, 683 F.3d at 1255). A plaintiff may make such a showing by pointing to evidence "such as '(1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly situated employees, and (3) pretext.'" *Jones*, 2024 WL 470347, at *4 (quoting *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (internal quotation marks omitted)). Though a showing of pretext is relevant, "a plaintiff's inability to disprove the defendant's rationale cannot be the sole grounds for summary judgment." *Ismael*, 161 F.4th at 764. A court "should ask whether [plaintiff's] circumstantial evidence, when artfully adhered together and viewed as one, allows a reasonable juror to envision an image of [discrimination] and find in [plaintiff's] favor." *Id.*

Plaintiff's allegations fail to form a convincing mosaic from which a reasonable fact finder could infer discrimination. Plaintiff has not pointed to any similarly situated employee who was treated more favorably, nor has Plaintiff established suspicious timing or pretext. The evidence demonstrates that, while still in her probationary period, Plaintiff

was habitually tardy, made substantive errors, and had conflict with other employees in the group. While she also experienced debilitating back pain during this same period, there is not enough circumstantial evidence that would allow a jury to determine that Plaintiff was fired or asked to resign because of her disability.

Plaintiff has failed to establish a prima facie case of ADA discrimination and has failed to set forth a convincing mosaic of ADA discrimination. Thus, her claim fails as a matter of law.

## II.    Punitive Damages (Count II)

In Count II, Plaintiff asserts a claim for punitive damages. (Doc. 1 ¶¶ 30–32). Punitive damages are limited "to cases in which the employer has engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 529–30 (1999) (quoting 42 U.S.C. § 1981a(b)(1)). Therefore, Plaintiff's punitive damages claim is derivative of Plaintiff's substantive discrimination claim. Having determined that Plaintiff's disability discrimination claim fails as a matter of law, it is inappropriate for punitive damages to be awarded and Defendant is entitled to summary judgment on this claim as well. *See, e.g., Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1304–05 (11th Cir. 2009); *see also Nurse v. Rhodes Fin. Servs., Inc.*, No. CV 117-108, 2019 WL 1114880, at *7 (S.D. Ga. Mar. 11, 2019).

## CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment (Doc. 21) is **GRANTED**.

**SO ORDERED**, this 20th day of March, 2026.

/s/ Leslie A. Gardner
**LESLIE A. GARDNER, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**